UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LATONYA STARKS,                    )
next friend for B.S.               )
                                   )
            Plaintiff,             )
                                   )
       vs.                         )        No. 4:04-CV-1444 (CEJ)
                                   )
SOCIAL SECURITY ADMINISTRATION,    )
Commissioner JoAnne B. Barnhart    )
                                   )
            Defendant.             )

<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I. **Procedural History**

On March 9, 1999, LaTonya Starks, on behalf of her minor
daughter B.S., filed an application for a period of supplemental
security benefits under the Title II of the Social Security Act, 42
U.S.C. §§ 1381 <u>et</u> <u>seq</u>. (Tr. 67). Ms. Starks stated that plaintiff
is disabled due to a hip operation that caused her right leg to be
one inch shorter than her left leg. (Tr. 87). The operation was
performed after plaintiff fractured her hip while skating in
January 1998. (Tr. 23). Plaintiff's disability onset date is
March 9, 1998.[1] (Tr. 95). Plaintiff requested a hearing before an
Administrative Law Judge ("ALJ") after receiving unfavorable

_____

[1]In the application for benefits, Starks wrote that
plaintiff's disability began on January 29, 1998. However,
pursuant to 42 U.S.C. § 423, retroactive benefits for individuals
entitled to SSI benefits are limited to a period of one year
before the claim was filed. Thus, in this case, the relevant
onset date is March 9, 1998.

initial and reconsideration determinations of her claim. (Tr. 80).
On April 26, 2000, the ALJ entered a decision denying plaintiff's
application for benefits. On June 5, 2000, plaintiff filed a
request for the Social Security Administration Appeals Council to
review the hearing decision. The Appeals Council remanded the
matter to a different ALJ. The second ALJ held a hearing on May
23, 2002, and issued an unfavorable decision on July 25, 2002. The
Appeals Council denied plaintiff's request for review. Plaintiff
filed a complaint in this Court on December 6, 2002. This Court
remanded the matter to the SSA on June 20, 2003. On May 25, 2004,
another hearing was held before an ALJ. An unfavorable decision
was issued on June 18, 2004. Plaintiff has exhausted her
administrative remedies and now seeks this Court's review.

## II.  Evidence Before the ALJ

Testimony was received by an ALJ at hearings on March 28,
2000, May 23, 2002, and May 25, 2004. A different ALJ presided
over each hearing. Dr. Marsa Alec testified as a medical expert at
the March 28, 2000, hearing. Ms. Starks testified at all three
hearings. Plaintiff testified at the 2002 and 2004 hearings.
Plaintiff was represented by counsel at all three hearings.

### A.  Hearing on March 28, 2000

Plaintiff was 12 years old at the time of the March 28, 2000,
hearing. At the hearing, Dr. Alec testified that he was a retired
physician who was board certified in 1950 and re-certified in 1974.
Dr. Alec testified that he examined the medical files on plaintiff
before giving his testimony. Plaintiff's medical records were from

Shriners Hospital for Children ("Shriners") and Children's Hospital ("Children's") in St. Louis, Missouri. Plaintiff had also been seen at the Graham Medical Building ("Graham"), a division of Christian Hospital, but Dr. Alec did not have those records and they were not present at the hearing. Dr. Alec testified that plaintiff had a disease process called fibrous dysplasia[2] to the hip that was caused by the femoral neck (hip) fracture plaintiff suffered from her skating fall. The head of the femur bone goes into the pelvis socket joining the hip and leg, he testified. Plaintiff's femur bone was pinned in surgery on January 29, 1988, Dr. Alec originally testified. The surgery also addressed a cyst that was on plaintiff's femoral head, he said.

The testimony of plaintiff's mother revealed that plaintiff had surgery in March 1998. Dr. Alec testified that plaintiff's hip was injected in January 1998, but he did not specify the substance that was injected. Surgery was performed in March 1998, after which plaintiff was placed in a cast. Dr. Alec testified that the March 1998 surgery was the only surgery plaintiff had received.

Dr. Alec testified that plaintiff made progress after her operation and could walk without crutches by May 18, 1998. The discrepancy between the length of plaintiff's legs caused her to have weakened muscles in her right leg and has strained the muscles in her back. Additionally, the discrepancy causes scoliosis, he testified. Throughout his testimony, Dr. Alec stated that

---

[2]A cystic bone lesion probably resulting from an anomaly during development. The Merck Manual of Diagnosis and Therapy 1354 (16th ed. 2000).

plaintiff was repeatedly told to have physical therapy but did not. He testified that physical therapy would strengthen her back and cause her to be able to run, jump and do other activities she complained of being unable to do. Dr. Alec also testified that plaintiff's medical records show that she refused to have an orthotic put into her shoe to help elevate the short leg. He testified that plaintiff's scoliosis is corrected with a three-fourths inch lift placed under her right foot. Dr. Alec testified that if plaintiff wore the shoe lift and went to physical therapy to strengthen her right leg muscles, "she might be able to do practically anything she wanted" and could live a normal life.

As of the March 2000 hearing, Dr. Alec testified that plaintiff was able to walk with a limp, sit, stoop, squat, stand, and use her arms and hands. He testified that plaintiff walks with a Trendelenburg gait, meaning that she throws her leg out to the side when she walks. Dr. Alec testified that plaintiff will continue to suffer from scoliosis, muscle weakness and atrophy if she does not have physical therapy on a regular basis.

Ms. Starks testified that plaintiff had been attending physical therapy twice a week at Graham since October 1999. She attends therapy there because it is closer to her home than Shriners, Starks testified. Dr. Alec stated that he did not see anything in the file about plaintiff attending physical therapy. The ALJ requested that plaintiff's attorney provide plaintiff's records from the Graham Medical Building. Starks also testified

that her daughter does the home exercise program that Shriners and Children's hospitals had provided for her.

At the time of the hearing, plaintiff attended Walnut Grove Elementary School, Ms. Starks testified. Plaintiff had a doctor's excuse and did not attend gym class. Ms. Starks testified that her daughter complains of pain in her back and leg. Plaintiff complains that it is hard to play with other children because she cannot run. Also, plaintiff would like to play basketball and jump rope but is unable to play any sport, she testified. Ms. Starks testified that plaintiff walks with a limp when she is not wearing the orthotic lift in her shoe. She testified that, for reasons unknown to her, it took a while for plaintiff to receive the lift after her surgery. She also testified that the lift hurts and plaintiff does not like to wear it. Ms. Starks testified that her daughter missed a February 21, 2000, physical therapy appointment because she did not have transportation.

**B. Hearing on May 23, 2002**

Plaintiff was a 14-year-old eighth grader at the time of the May 2002 hearing. Ms. Starks testified that plaintiff weighed 120 pounds, but she did not know plaintiff's height. Plaintiff shared a home with her mother and her 11-year-old sister. Ms. Starks testified that she applied for disability benefits because plaintiff's right leg is one inch shorter than her left leg, plaintiff walks with a limp and drags a leg, and plaintiff had been having back problems.

Ms. Starks testified that plaintiff has had two operations. She stated that cortisone was injected into a cyst in plaintiff's fractured hip in the first surgery. She testified that plaintiff was in a body cast for eight weeks. Ms. Starks did not remember what procedures were performed in plaintiff's March 1998 surgery. However, she testified that the surgeries resulted in plaintiff's right leg being one inch shorter than her left leg. After both surgeries, plaintiff walked on crutches for four to six weeks. She did not use any other device to assist her in walking after she stopped using the crutches. Because plaintiff did not timely receive her shoe lift, she walked with a limp. Plaintiff complained of back problems and could not walk for an entire block. Plaintiff complained that her back hurt after walking up a couple of stairs. She asked to be carried her up the stairs, but Ms. Starks refused.

Ms. Starks testified that she took her daughter to Shriners for appointments. The doctors took X-rays of plaintiff and talked among themselves. They told Ms. Starks that plaintiff was improving, but they did not explain further, she testified. Plaintiff wears the lift in her shoe, her mother testified. However, plaintiff cannot stand up straight and struggles to keep her balance. Plaintiff has a hard time stooping down and cannot kneel. Plaintiff does not have a problem lifting or carrying things, her mother testified. Plaintiff does not have any trouble sleeping, or taking care of her personal hygiene. She does household chores, such as cleaning dishes, and her homework.

Ms. Starks testified that plaintiff's doctors had excused her
from gym class from 1998 forward.  Plaintiff is not involved in any
kind of after-school clubs or social activities.  She gets along
with other children, but they call her names because she has a
metal plate in her hip.  Plaintiff gets angry when others make fun
of her, Ms. Starks testified.  Plaintiff makes "so-so" grades in
school.  Her peers disturb her in class and keep her from focusing.
Plaintiff does not complete homework assignments, her mother
testified.

Plaintiff testified that she goes home after school and talks
on the phone.  She visits her grandmother's house on weekends and
watches television with her cousin.  Plaintiff testified that she
does not know how to swim but she can "kind of" ride a bike.  She
goes to the shopping mall with her uncles and cousins, but not with
her friends.  She last tried to run at the beginning of the third
quarter of the school year because the gym teacher made her.  She
was in gym class because the nurse had not told the teacher that
plaintiff could not take gym, plaintiff testified.

**C.  Hearing on May 25, 2004**

Plaintiff and Ms. Starks again testified at the May 2004
hearing before the ALJ.  At the time of this hearing, plaintiff was
a 16-year-old ninth grader.

Ms. Starks testified that, since March 1999, plaintiff had
gained a little weight due to normal growth.  She testified that
she, plaintiff, and her 13-year-old daughter share a house.  She
also testified that plaintiff does not take any special education

classes at school and does not have a counselor or social worker at school.  At the time of the hearing, plaintiff had not applied for a driver's license.  She was not involved in any kind of youth activities, such as sports, church groups, or school clubs.  At home plaintiff cleans her room, washes dishes, takes the trash out and does homework.  Ms. Starks testified that she has full-time work in customer service and earns $12.50 per hour.  The only other income into the home is a $197 monthly Social Security survivor's benefit check for plaintiff's younger sister, whose father is deceased.

Ms. Starks again testified that plaintiff had two operations on her hip.  She testified that both were performed at Children's Hospital.  She testified that plaintiff walks with a limp and wears a shoe lift.  Plaintiff had been wearing the shoe lift daily since April 1998, Ms. Starks testified.  She testified that after plaintiff got out of the body cast she was given a shoe lift.  She testified that plaintiff's leg and lower back bother her when she walks.  Plaintiff also complains about her back while sitting. Plaintiff has asked to be picked up when she has been walking for more than 40 minutes.  Walking up stairs bothers plaintiff's lower back, her mother testified.  Plaintiff walks slowly up the stairs. Ms. Starks testified that plaintiff complains about her back about two or three times a week.  A month before the hearing plaintiff's aunt picked her up from school because plaintiff had been complaining about her back to the school nurse.  This has happened

more than ten times, Ms. Starks said. Ms. Starks testified that plaintiff takes Aleve, Ibuprofen, and Tylenol for her hip and back.

Plaintiff was being treated at Shriners Hospital for her back and hip, her mother testified. The doctors have stated that they do not know why plaintiff's back bothers her. At the doctor's office, plaintiff is unable to stand up straight when asked. Plaintiff leans to the right. Plaintiff has to take time to bend and to get up from the floor. Also, plaintiff cannot stoop. About four times a month, plaintiff gets up at night and complains of back pain.

At the time of the hearing, Ms. Starks was not aware of any additional surgery planned for plaintiff's hip or back. Plaintiff's regular doctor is at Browridge Pediatrics. He sent her to Christian Hospital to get an x-ray. After the x-ray, Ms. Starks was told that plaintiff needs to see an orthopedic doctor. Ms. Starks's response was that plaintiff was already being seen at Shriners. She also testified that plaintiff has partial scoliosis. Ms. Starks testified that she does not understand what the doctors at Shriners are saying when they talk about plaintiff. The doctors usually talk out of her presence, she testified.

Plaintiff testified that it had been about two years since she had any physical therapy for her back or legs. She testified that she does exercises at home. In one exercise, she lays on the floor, sits up and touches her toes, she said. She does this exercise about three times a week, she testified. After school, she talks on the phone and does her homework while she's on the

phone.  She watches television and sits on the porch with her sister and her sister's friend.  If she has money, she goes to the candy store around the corner with her sister.  Then, she resumes talking on the phone until her mother comes home.  Plaintiff testified that she wears a lift in her shoe all the time.

### III. Medical Evidence

On January 21, 1998, Michael Spezia, D.O., assessed that plaintiff injured her right hip and leg while skating.  (Tr. 166). Plaintiff saw surgeon J. Eric Gordon, M.D., at Children's Hospital on January 29, 1998.  Dr. Gordon found that plaintiff had a pathologic minimally displaced femoral neck fracture with a lesion that appeared to be a cyst in the femoral neck.  Plaintiff's family agreed to Dr. Gordon's recommendation that plaintiff be taken to the operating room for an "attempted injection of the lesion for diagnostic purposes and closed reduction and application of a SPICA cast." (Tr.183).

Plaintiff saw Dr. Gordon again on February 24, 1998, for an MRI.  The MRI showed that plaintiff had a solid lesion in her femoral neck that resembled fibrous dysplasia but was well demarcated.  Dr. Gordon also removed plaintiff's Spica cast. During this visit, Dr. Gordon and Ms. Starks discussed performing a biopsy, placing an internal fixation using a blade plate, and bone grafting.  Ms. Starks stated that she was comfortable with proceeding with those plans.

On March 2, 1998, Dr. Gordon wrote a report on what he planned to do in plaintiff's operation and the reasons for the operation.

He also gave diagnoses for before and after the surgery.  He wrote the following:

> **INDICATIONS FOR SURGERY:**  The patient is a nearly 10-year old female with a two month history of right hip pain.  One month ago she was seen and radiographs were obtained and she was noted to have a lesion in her right femoral neck with a pathologic fracture.  She was placed into a Spica cast and at that aspiration and injection of the lesion which was felt to be most likely a cyst was carried out.  Aspiration and injection was not felt to be possible, therefore, an MRI was obtained recently which revealed the lesion to be solid.  This was felt to represent possibly fibrous dysplasia versus a chondromyxoid fibroma, therefore, after discussion with the family it has been elected at this time to proceed with biopsy of the lesion, curettage, and bone grafting using hydroxyapatite and internal fixation using a blade plate to prevent further pathologic fracture.

(Tr. 171).  The preoperative and postoperative diagnoses were lesion with pathologic fracture, right femoral neck.  The record also shows that, on March 2, 1998, an operation was performed on plaintiff in which there was curettage and bone grafting.  There was also prophylactic internal fixation right femoral neck and a biopsy of a lesion.  (Tr. 169).  Also on March 2, 1998, plaintiff was prescribed Tylenol #3 elixir to take by mouth every four hours for pain.  Her discharge instructions stated that plaintiff could engage in her regular bathing and diet routines.  She was instructed that she could return to school when tolerated, but that she could not take gym class.  A March 3, 1998, surgical pathology report states that plaintiff's clinical diagnosis was "possible fibrous dysplasia vs chondromyxofibroma."[3]  (Tr. 192)

---

[3]A type of benign tumor of the bone.  The Merck Manual of Diagnosis and Therapy 1351-52 (16th ed. 2000).

11

On March 17, 1998, plaintiff visited with Dr. Gordon. This appointment was about 10 days after her operation. Dr. Gordon stated that plaintiff's x-rays showed that the inserted plate was positioned well. He also stated that plaintiff was in a "a little bit of valgus"[4] and he hoped that would give her more stability. The bone grafting was done well, he wrote. He also wrote that her trochanter[5] looked to be stable though it appeared that it moved just a little bit. For treatment he stated that plaintiff would continue to be "toe touch" weight bearing.

An April 14, 1998 visit with Dr. Gordon was for a recheck status post bone grafting of plaintiff's fibrous dysplasia with internal fixation. Dr. Gordon stated that plaintiff was doing "quite well." He wrote that she was weight bearing as tolerated and only had a mild limp. He gave her a note excusing her from all physical education classes and informed her mother that plaintiff probably would not be able to play sports for a long time. (Tr. 179).

On May 18, 1998, plaintiff told Dr. Gordon that she could walk without her crutches but still used them because she liked them. Dr. Gordon asked the physical therapy department to work with plaintiff on strengthening exercises and discontinuing her crutches. (Tr. 178). On July 13, 1998, Dr. Gordon found that plaintiff had a little soreness over the area where she had had

---

[4]Bent or twisted away from the midline of the body; knock-kneed. Stedman's Med. Dict. 1926 (27th ed. 2000).

[5]One of the bony prominences near the upper extremity of the femur. Stedman's Med. Dict. 1878 (27th ed. 2000).

surgery.  She was not tender over the fracture site or her plate.
Her abductor weakness was significant.  She was walking with "a bit
of a Trendelenburg lurch."  He added that he wanted to put
plaintiff on a more aggressive physical therapy program because she
was not making much progress exercising on her own.  (Tr. 177).

On November 20, 1998, plaintiff saw Fred Heidenreich, M.D., at
the Washington University Medical Center, for a routine checkup.
Dr. Heidenreich found that plaintiff had not had any problems since
her July 1998 examination.  He found that plaintiff had 80 degrees
of straight-leg abduction, approximately 70 degrees of flexed
abduction, and no pain with rotation.  Plaintiff's x-rays showed
significant consolidation of her graft from her previous visit.
There was no evidence of avascular[6] necrosis.  Dr. Heidenreich's
impression was that plaintiff was doing very well.  He wrote that
plaintiff should plan for a followup visit in six months.  (Tr.
176).

On February 17, 1999, plaintiff saw Dr. Gordon for a
"recheck."  She was complaining of pain in her hip.  Upon physical
examination, Dr. Gordon stated that plaintiff walked with a
significant Trendelenburg gait and had a "fair amount" of abductor
weakness.  He found some tenderness over the plate that was
inserted in plaintiff's hip.  A review of plaintiff's x-rays
revealed that the fibrous dysplasia in her proximal femur
persisted.  He added that it seemed to be filling in.  In his

_____

[6]Pathologic death of cells, tissue or organ, due to
deficient blood supply.  Stedman's Med. Dict. 1184 (27th ed.
2000).

13

treatment plan, Dr. Gordon stated that plaintiff was doing well overall. He stated that he wanted to leave the plate in to stabilize plaintiff's hip area. He added that he wanted to get her started on a physical therapy program, especially on abductor strengthening to increase her strength and decrease her pain. (Tr. 175). In a radiology report, dated February 16, 1999, it was noted that there had been very little change in plaintiff's condition since her November 10, 1998, examination. However, the following impression was given in the report: "Status post internal fixation with packing of the right femur, with good incorporation and near anatomic alignment." (Tr. 185). On May 11, 1999, Dr. Gordon found that plaintiff's condition had not changed since her February 19, 1999, x-rays. He found mild valgus deviation at both knees that was more prominent on the right. (Tr. 234).

Plaintiff again saw Dr. Gordon on May 27, 1999. She complained of right hip pain and trouble running and jumping rope. She was not taking pain pills at that time. Dr. Gordon assessed that plaintiff had right hip pain caused by significant muscle weakness due to status post open reduction internal fixation of the hip fracture. The strength of her entire right lower extremity, especially her gluteus medius, significantly decreased. When weight bearing, she experienced decreased right knee stability. Weakness in her gluteus medius caused gait deviation. Dr. Gordon suggested physical therapy to treat plaintiff's condition. (Tr. 235-37). Also on May 27, 1999, physical therapist Gosia Flynn noted that plaintiff "never received physical therapy treatment

after surgery, except for therapy session while in the hospital." (Tr. 235).

Diane M. Rup, M.D., of the Forest Park Medical Clinic, examined plaintiff on May 15, 1999, because plaintiff complained about her hip surgery. Dr. Rup noted that plaintiff was 57-1/2 inches tall and weighed 79 pounds. She was not taking any medication. Dr. Rup recorded that plaintiff appeared to be well and alert. She noted that plaintiff hears and understands conversational speech. Plaintiff also spoke clearly. Dr. Rup recorded that plaintiff's back was symmetric and well formed. She added that plaintiff's right leg was one inch shorter than her left causing an unsteady and wobbly gait. She added that plaintiff "is allowed to participate in gym." Dr. Rup stated that plaintiff's musculoskeletal health was "[r]emarkable for the fact that the right leg is 1 inch shorter than the left and she has decreased strength over that hip and leg." The doctor found plaintiff's hip flexion extension to be full. However, her right hip only had 50 percent of internal and external rotation of the left hip. Dr. Rup wrote in her clinical impression: "On today's exam she has an unsteady gait but is able to walk without assistance briskly up and down the floor." (Tr. 196-98).

On August 30, 1999, plaintiff was seen by Michael Raemisch, M.D., and Elizabeth Engel, M.D., at the Cardinal Glennon Children's Hospital for an orthopedic clinic visit. On examination, Dr. Raemisch noted that plaintiff exhibited a Trendelenburg gait on the right. Her pelvis was level on her two-leg stance. She could

easily stand on her left foot, but she leaned significantly to the right when standing on the right foot. There was atrophy of plaintiff's right quadriceps, and plaintiff complained that her right greater trochanter was somewhat tender. Her scar had healed and she could easily flex both hips to 90 degrees. Dr. Raemisch noted that plaintiff experienced pain with internal rotation of the right hip at about 10 degrees. Straightening her right leg was also painful. Dr. Raemisch assessed status post curettage and bone grafting. He also assessed open reduction and internal fixation of the right femoral neck with hip abductor weakness. Dr. Raemisch and Dr. Engel wrote a plan for plaintiff to begin a physical therapy program with hip abductor strengthening. They prescribed plaintiff two sessions per week with a home exercise program. The physicians also discussed with plaintiff's mother that leg lengths were "likely not the issue." (Tr. 223-26).

Plaintiff received physical therapy treatment at Christian Hospital in October 1999. (Tr. 208-17). A physical therapy report from October 6, 1999, shows that plaintiff had moderate hip atrophy. (Tr. 212). The physical therapist gave plaintiff instructions on wearing orthotics in her shoes. After the first two weeks of wear, he stated that she should be wearing orthotics all day, or for eight hours per day. He also stated that after the first or second week, plaintiff could begin running with the orthotics. (Tr. 215). Plaintiff failed to show for three physical therapy appointments in October 1999 and one appointment in November 1999. (Tr. 216). Plaintiff attended physical therapy at

Children's Hospital on May 27, 1999, and received a home exercise program. She was told that the gait in her walk would not improve unless her muscles were strengthened. (Tr. 237).

Plaintiff went to the emergency room at Christian Hospital on November 4, 1999, with complaints of an earache. Two days prior to that visit she was treated for strep throat and was prescribed Amoxil. The diagnosis was acute otitis media. Plaintiff was prescribed plaintiff acetaminophen and a Cortisporin Otic Supp III for placement in her ear.

On January 21, 2000, plaintiff went to Shriners Hospital with complaints of hip and back pain. Plaintiff complained that her back hurts after walking any length of distance. The medical report states that plaintiff "refuses to wear her shoe insert for her length discrepancy." It states that plaintiff is a poor historian, and it is difficult to get her story. Eric Graham, M.D., and Perry L. Schoenecker, M.D., treated plaintiff. They wrote that plaintiff has a gait and tends to walk in an out-toed duck walk. She could go from a squat to a stand without difficulty. They found that plaintiff has positional scoliosis that is corrected with a three-fourths inch lift placed under her right foot. The doctors recommended therapy for plaintiff. They also recommended that she wear the shoe lift. (Tr. 237-40).

Physical therapist Jennifer Fischer also saw plaintiff on January 21, 2000. She wrote that plaintiff was then receiving physical therapy at Graham Medical Center a few times per week. She also wrote that plaintiff did not wear her shoe lift because

she complained that it hurt her back.  Plaintiff's mother requested that plaintiff receive outpatient therapy from Shriners.  Plaintiff was given a home exercise plan.  (Tr. 241).  Plaintiff failed to keep a physical therapy appointment with Fischer on February 21, 2000.

Plaintiff attended physical therapy at Graham Medical Center on two out of four scheduled dates in February 2000. (Tr. 249).  On March 3, 2000, plaintiff was to have her last scheduled physical therapy visit at Graham, but she did not come.  On March 20, 2000, she appeared for physical therapy at Graham and was not wearing her shoe lift.  On March 23, 2000, plaintiff failed to attend a physical therapy session.  (Tr. 248).  A March 28, 2000, letter from Graham Medical Center states that plaintiff had completed physical therapy treatment as of the date of the letter.  (Tr. 246).  In a physical therapy report, also dated March 28, 2000, it was noted that plaintiff had been seen for eight sessions since January 24, 2000.  The report states that plaintiff had made improvements.

On January 24, 2000, Armand E. Brodeur, M.D., of Shriners Hospital saw plaintiff.  He stated that her right femoral neck was sclerotic and irregularly ossified.  He observed that plaintiff's left leg was about six centimeters longer than the right leg.  On September 18, 2000, Dr. Brodeur noted that both of plaintiff's femoral heads were spherical and satisfactorily positioned.  He also wrote that the blade plate supported osteotomy on the right had not changed.  On May 21, 2001, Dr. Brodeur noted that

plaintiff's right femoral neck had healed and was supported by a blade plate. He also wrote that she had coxa valga[7] on both sides, but it was greater on the right side. There was also slight bilateral subluxation. (Tr. 318).

Dr. Schoenecker saw plaintiff on September 15, 2000. Her shoe insert, which was prescribed at three-fourths inch, then measured a half inch. X-rays showed that the lesion on plaintiff's femoral neck was healing nicely. Although plaintiff complained of back pain in her thoracic spine area, it was not bothering her on the date of the visit. Plaintiff did not complain of hip pain. Also, Dr. Schoenecker stated that plaintiff was flexible and could almost touch the floor. The doctor also noted that plaintiff, then age 12, was nearing the end of her growth. (Tr. 315).

Plaintiff was seen by Gonzalo Sanchez, M.D., on May 18, 2001. He noted that plaintiff did not wear her right shoe insert "secondary to appearance." The doctor's examination revealed that plaintiff's back has full range of motion and no point of tenderness. He did not find any clinical scoliosis. Plaintiff's right hip was tender slightly over the greater trochanter area. The doctor stated this was probably due to the prominence of plaintiff's plate. Dr. Sanchez sent plaintiff to get another half-inch shoe lift. He recommended that plaintiff return in six months. He also stated that he would then discuss with plaintiff

_____

[7]Alteration of the angle of the femoral neck to the femoral shaft. Stedman's Med. Dict. 420 (27th ed. 2000).

and her parents the possibility of removing plaintiff's hardware if Dr. Schoenecker thought it was a good idea. (Tr. 315).

Plaintiff saw David Gwyn, M.D., at Shriners Hospital on November 16, 2001. She had questions about removing the plate in her hip. Dr. Gwyn found that the fracture appeared to be healed and there was some sclerotic bone around the blade plate. However, he felt that it would be prudent to leave the plate in plaintiff's hip indefinitely. (Tr. 311).

Medical records for five visits to Brownridge Pediatrics are included in the transcript. The visits took place between January 2000 and March 2002. On January 11, 2000, it was noted that plaintiff had back pain and mild scoliosis. (Tr. 322). The remaining four visits, held in November and December of the year 2000, January 2001 and March 2002, did not involve any of the medical conditions at issue in this case. (Tr. 325).

On October 10, 2002, plaintiff saw Dr. Schoenecker at Shriners Hospital. Plaintiff complained of pain over her hip plate. Dr. Schoenecker took an x-ray of the area, but could not determine what could be causing the pain. During the visit, Dr. Schoenecker suggested to plaintiff's father that plaintiff become more active and start taking gym class. He said that she should not do activities, such as slide tackle soccer, that could cause her to suddenly twist her hip. The doctor also stated that the discrepancy in the length of plaintiff's legs was no more than three-eighths of an inch. He added that plaintiff said the discrepancy does not bother her. (Tr. 380).

When plaintiff saw Dr. Schoenecker on January 17, 2003, she had no complaints. She had a leg length discrepancy of five-eighths of an inch and wore a one-half inch lift in her right shoe. A review of plaintiff's x-rays showed that plaintiff's right femoral neck was well healed and her hip plate was intact and in place. (Tr. 381).

David King, M.D., saw plaintiff on November 7, 2003. Plaintiff's hip motion, with symmetric internal and external rotation, flexion, and abduction, was excellent. She did not have any pain with hip motion. Her leg length discrepancy remained at five-eighths of an inch. Her distal neurovasucalr exam was intact. Dr. King stated that the plan was for plaintiff to continue her activities as tolerated and follow up in a year. (Tr. 382). Plaintiff was seen at Brownridge Pediatrics on February 20, 2004. (Tr. 388). She complained of back pain. Dr. S. McGowan's impression was midline back pain. He planned to x-ray plaintiff's back and suggested that she take two 200mg Motrin tablets.

Laura Copaken, M.D., of Shriners Hospital, saw plaintiff on March 5, 2004. At this time, plaintiff was 16 years old. Plaintiff complained of midline back pain. She stated that she had been taking the Aleve that had previously been prescribed to her, but she had not been complying with the exercise assignment. Plaintiff also reported that she had missed several days of school because of her back pain. An x-ray revealed that plaintiff's bone cyst was well healed. It showed her to have an approximate two centimeter leg length discrepancy. The x-ray did not show any

specific abnormalities in the thoracal lumbar spine. Plaintiff's scoliosis was found to be mild at less than 10 degrees. Dr. Copaken recommended that plaintiff get a bone scan to see if she had any unusual bony pathology. The doctor also stated that plaintiff was to wear her one-half inch shoe lift more regularly and do her back strengthening and stretching exercises. The doctor planned to see plaintiff in four months. Plaintiff could be seen sooner if her pain worsened or if she began to have bladder problems. (Tr. 334).

Radiologist Henry D. Royal, M.D., wrote a report of plaintiff's March 23, 2004 bone scintigraphy.[8] He found no abnormalities of plaintiff's thoracic or lumbar spine. He found abnormal focal uptake in her right hip that is consistent with her previous surgical history. However, he also found a focus of increased uptake in plaintiff's left scapula on the posterior view. This finding did not correlate with plaintiff's pain and is of unknown clinical significance, he stated. Dr. Royal's opinion was that there were "[n]o abnormalities to correlate with patient's mid thoracic and lumbar spine pain." (Tr. 402).

## IV. The ALJ's Decision

The ALJ made the following findings:

1. The child was born [in 1988] and just completed the 9th grade.

2. The child has not engaged in substantial gainful activity since the alleged onset date (20 CFR § 416.924(b)).

---

[8]A diagnostic procedure consisting of the administration of a radionuclide with an affinity for the tissue of interest. Stedman's Med. Dict. 1602 (27th ed. 2000).

3.    The child has "severe" impairments (20 CFR § 416.924(c)).

4.    The condition of the child's right leg (history of a fracture, status post femoral internal fixation surgery, and her right leg is approximately 3/4" shorter than her left leg) and her mild scoliosis do not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P, the Listing of Impairments. (20 CFR §§ 416.924(d)(1), 416.925 and 416.926)

5.    The child does not have an "extreme" limitation in any domain of functioning, a "marked" limitation in two domains of functioning, and does not functionally equal the severity of the listings (20 CFR §§ 416.924(d)(2) and 416.926a).

6.    The subjective complaints on the child's behalf are credible only to the extent they are supported by the evidence of record as summarized in the text of this decision.

7.    The child has not been under a "disability" at any relevant time from the alleged onset date through the date of this decision (20 CFR § 416.906).

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"An individual under the age of 18 shall be considered disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I). To qualify for SSI benefits, a child must satisfy the following three factors: (1) she must not be engaged in substantial gainful activity; (2)her impairment must equal the duration requirement; and (3) the impairment must match or be medically equivalent to a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.[9] See Sullivan v. Zebley, 493 U.S. 521, 526 (1990). "In plain words . . . a child is entitled to benefits if his impairment is as severe as one that would prevent an adult from working." Id. at 529.

"[I]n general, a child's impairment(s) is of 'listing-level severity' if it causes marked limitations in two broad areas of functioning or extreme limitations in one such area." 20 C.F.R. § 416.925(b)(2). A child has a "marked" limitation when her "impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities. [Her] day-to-day functioning may be seriously limited when [her]

---

[9]"The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect." Sullivan, 493 U.S. at 529-30.

impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is more than moderate but less than extreme. Id. A child has an "extreme" limitation when her "impairment(s) interferes very seriously with [her] ability to independently initiate, sustain, or complete activities. [Her] day-to-day functioning may be very seriously limited when [her] impairment(s) limits only one activity or when the interactive and cumulative effects of [her] impairment(s) limit several activities." Id. at § 416.926a(e)(3)(i). An extreme limitation is more than marked. Id.

A.  **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B. **Plaintiff's Allegation of Error**

Plaintiff's administrative appeal raises the issues of (1) whether the ALJ failed to properly evaluate all of the medical evidence in determining that plaintiff's impairment did not meet the listing of impairments, and (2) whether the ALJ failed to properly assess the credibility of the testimony of plaintiff and her mother under the Polaski factors. Defendant argues that the ALJ properly determined that plaintiff's impairments did not meet,

equal, or functionally equal a listed impairment. She also argues that the ALJ properly evaluated Ms. Starks's testimony.

In her first argument, plaintiff argues that the ALJ's decision impermissibly determined to only consider evidence subsequent to the SSI application date of March 1999. Thus, she argues that the decision failed to fully and fairly develop the evidence of the record. In the decision states: "Because no retroactive disability benefits are payale under title XVI, this decision will decide the issue of disability only with respect to the period since the protective filing date of March 9, 1999." However, the decision evaluates plaintiff's medical history from January 1998 forward. Pursuant to 42 U.S.C. § 423, retroactive benefits for individuals entitled to SSI benefits are limited to a period of one year before the claim was filed. Thus, in this case, the relevant onset date is March 9, 1998. All medical records from that date are relevant. Because the ALJ's decision evaluates plaintiff's medical history beginning from January 1998, the Court finds that decision fully and fairly developed the evidence of record.

Plaintiff argues that the record demonstrates that she has had major dysfunction of the right hip, a weight-bearing joint, and reconstructive surgery that satisfies Listings 101.02 and 101.03. She argues that her Trendelenburg gait illustrates that she is unable to ambulate effectively. She also argues that "once all medical treatment was rendered properly Plaintiff complied with treatment and was able to ambulate in a fairly normal fashion.

However, until that point, it does not appear Plaintiff received the full benefit of physical therapy or the shoe lift." Thus, she argues that her impairment meets the Listings. The Listings upon which plaintiff relies state:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A.   Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .
> 1.03 *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §1.00B2b reads in relevant

part:

> b.  *What We Mean by Inability To Ambulate Effectively*
> (1) *Definition*.  Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces . . .

Importantly, §1.00J reads in relevant part:

*J. Orthotic, Prosthetic, or Assistive* Devices
    *2. Orthotic devices*.  Examination should be with the
orthotic device in place and should include any evaluation of
the individual's maximum ability to function effectively with
the orthosis.  It is unnecessary to routinely evaluate the
individual's ability to function without the orthosis in
place.  If the individual has difficulty with, or is unable to
use, the orthotic device, the medical basis for the difficulty
should be documented.  In such cases, if the impairment
involves a lower extremity or extremities, the examination
should include information on the individual's ability to
ambulate effectively without the device in place unless
contraindicated by the medical judgment of a physician who has
treated or examined the individual.

The Court finds that there is substantial evidence to support

the ALJ's conclusion that plaintiff is not disabled.  In the 12

months following the March 9, 1998, onset date, plaintiff was not

disabled.  Ms. Starks testified that plaintiff only used crutches

for four to six weeks after her March 1998 surgery.  She further

stated that plaintiff did not use any other assistive device.  On

her May 18, 1998 visit with Dr. Gordon, plaintiff stated that she

could walk without crutches.  On the same date, Dr. Gordon also

requested that the physical therapy department help wean plaintiff

from crutches. Further, in her May 2004 testimony before the ALJ,

Ms. Starks testified that plaintiff was given a shoe lift in April

1998 after her body cast was removed.  This shows that within 12

months of the disability onset date, plaintiff was able to ambulate

effectively without assistance.

On July 13, 1998, Dr. Gordon wrote that plaintiff had full

range of motion of her hips and was not tender over her fracture

site or her plate.  She only had "a bit" of a Trendelenburg gait.

 This shows that plaintiff's ability to ambulate effectively was

only slightly hindered.  He noted that plaintiff needed a more

aggressive physical therapy program because she was not making progress exercising on her own. However, by her February 17, 1999, appointment plaintiff's Trendelenburg gait was "fairly significant." Additionally, she had a "fair amount" of abductor weakness. Dr. Gordon suggested getting her started on physical therapy "again." On May 27, 1999, a physical therapist wrote that plaintiff had not received physical therapy since her surgery, except for sessions while she was at the hospital. Plaintiff's mother testified that plaintiff began attending physical therapy twice a week in October 1999. These facts show that in the first 12 months following her surgery, plaintiff's progress was hindered by her own failure to follow her doctor's instructions and attend physical therapy. The medical records show that her limp grew from mild to significant as time passed due to plaintiff's failure to exercise and strengthen her muscles. Because plaintiff was able to ambulate without assistance during periods of the 12 months following her onset date, she is not disabled under the Listing. There is substantial evidence to support the ALJ's finding.

After the first 12 months, plaintiff's ability to ambulate effectively continued. The medical records show that she continued to walk with a gait, experience pain, and developed mild scoliosis. However, they also show that these problems were eliminated when plaintiff wore the orthotic lift that she was prescribed. Plaintiff's mother testified that plaintiff received a shoe lift in October 1999. Throughout the medical record, doctors and physical therapists note that plaintiff did not wear her lift. After

plaintiff complained that the three-fourths inch lift hurt her back, she was prescribed a more comfortable one-half inch lift. She did not wear this lift either. Although she was told that physical therapy would strengthen her muscles and decrease her pain, she failed to keep several appointments and did not attend on a consistent basis.

Pursuant to the Listing, plaintiff's medical examinations are to be based on her maximum ability to function with her orthotic in place. Because the majority, if not all, of plaintiff's problems were solved when she consistently wore her lift, she does not meet the Listing. Further, at the May 2004 ALJ hearing, Ms. Starks testified that plaintiff could walk 40 minutes before complaining of back pain. Contrary to plaintiff's argument that she was able to ambulate normally when "all medical treatment was rendered properly," the Court finds that plaintiff was able to ambulate normally when she followed all of her physician's instructions. There is ample evidence to support the ALJ's decision that plaintiff has not and does not suffer from a listed impairment.

Plaintiff's second argument is that the ALJ did not properly consider the testimony of Ms. Starks and plaintiff under the Polaski factors. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), states:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimants' daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;

>      4.  dosage, effectiveness and side effects of medication;
>      5.  functional restrictions.
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints *solely* on the basis of personal
> observations.  Subjective complaints may be discounted if
> there are inconsistences in the evidence as a whole.

The ALJ's credibility decision addresses the five <u>Polaski</u> factors.  Specifically, the decision notes that plaintiff and her mother testified that she wore her shoe lifts daily from the time she was given them.  However, the decision adds, the medical record reflects differently.  The Court finds that there is significant evidence in the record to support this finding.  Additionally, one of plaintiff's doctors noted that plaintiff was a "poor historian" who could not get her story straight.  Further, the record shows that plaintiff often did not take medicine for pain.  Although her mother repeatedly testified that plaintiff's doctors would not allow her to take gym class, she did not mention the doctors' insistence that plaintiff become more active in daily activities, including gym.  The Court finds that there is substantial evidence to support the ALJ's consideration of the testimonies of Starks and plaintiff testimony under the <u>Polaski</u> standards.

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of August, 2006.